# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

Case No. 16-2536

_____

## CHRISTINE BERNAT
*Plaintiff-Appellant*

v.

**STATE OF NEW JERSEY DEPARTMENT OF CORRECTIONS, EDNA MAHAN CORRECTIONAL FACILITY FOR WOMEN, WILLIAM HAUCK, administrator of the Edna Mahan Correctional Facility for Women, ERICK MELGAR, JANETTE BENNETT, ALFRED E. SMALLS, JEFFREY S. ELLIS, LANCE K. JOHNSON, all individually and in their capacity as a current and/or former State Correctional Officers, JOHN DOE 1-10, and JOHN DOE ENTITY 1-10,**

*Defendants-Appellees*

On Appeal from the United States District Court
For the District of New Jersey, No. 12-2649 (Hon. Michael A. Shipp, U.S.D.J.)

## Brief for Appellees

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW
JERSEY
R.J. Hughes Justice Complex, P.O. Box 112
Trenton, New Jersey 08625-0112
*Attorney for Defendant-Appellee*
*New Jersey Department of*
*Corrections, Jeffrey S. Ellis, Lance K.*
*Johnson, and Administrator Hauk*

Lisa A. Puglisi                    Nicole E. Adams
Assistant Attorney General         Deputy Attorney General
     Of Counsel                        On the Brief

## Table of Contents

**Page**

Table of Authorities ................................................................... iii

Counterstatement of Jurisdiction .............................................1

Counterstatement Issue Presented............................................1

Counterstatement of Related Cases and Proceedings ...............1

Counterstatement of the Case ...................................................2

Summary of Argument ............................................................14

Counterstatement of The Standard of Review.........................14

Argument.................................................................................15

  I. The Distrct Court Properly Dismissed Appellant's Section 1983 Claim. .......15

  II. The District Court Properly Dismissed Appellant's Negligence Claims.......26

  II. Even if The Court Finds That The Conduct of Hauck Gives Rise to Liability Under 42 USC 1983 Or The New Jersey Civil Rights Act, The Claims Would Be Properly Dismissed Under The Doctrine Of Qualified Immunity (Argued Below But Not Addressed. ..........................................................30

    A. Qualified Immunity Protects All But Those Who Knowingly Violate The Law. ..............................................................30

    B. No Clearly Established Law Existed Classifying Any of Hauck's Actions as UnconstitutionaThe District Court Properly Dismissed Appellant's Negligence Claims........................................................32

Conclusion ..............................................................................34

Certifications ..........................................................................35

# **Table Of Authorities**

## **Cases**

Anderson v. Creighton, 483 U.S. 635 (1987) ...........................................31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................15

Ashcroft v. al-Kidd,  563 U.S. ____, 131 S. Ct. 2074 (2011) ..................31

Beers-Capitol v. Whetzel, 256 F. 3d 120 (1970)........................ 16, 17, 18

Blackhawk v. Pennsylvania, 381 F.3d 202 (3d Cir. 2004) .......................14

Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358 (3d Cir. 1992),

    cert. denied, 507 U.S. 912 (1993) ....................................................14

Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000)..........................................14

Brosseau v. Haugen, 543 U.S. 194 (2004)................................................30

Carroll v. Carman, ___ U.S. ___, 135 S. Ct. 348 (2014).........................32

Carter Lincoln-Mercury v. EMAR Group, 135 N.J. 282 (1994)..............27

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................14

Curley v. Klem,  499 F.3d 199 (3d Cir. 2007)..........................................30

Di Cosala v. Kay, 91 N.J. 159 (1982).......................................................26

Farmer v. Brennan, 511 U.S. 825 (1970)........................................ 16, 17

Monell v. Dept. of Social Services, 436 U.S. 658 (1976) ........................15

Pearson v. Callahan, 555 U.S. 223 (2009)................................................30

Ramos v. Flowers, 429 N.J. Super. 13 (App. Div. 2012)................... 15, 29

Rezem v. Millstone, 423 N.J. Super. 103 (App. Div. 2011)......................15

Saucier v. Katz, 533 U.S. 194 (2001) .......................................................30

Trafton v. City of Woodbury, 799 F. Supp. 417 (Dist. Ct. 2011) ............15

Weinberg v. Dinger, 106 N.J. 469 (1985) .................................................27

## **Statutes**

18 U.S.C. § 1331 .................................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

42 U.S.C. § 1367 .................................................................................... 1

42 U.S.C. § 1983 ............................................................................ *passim*

## COUNTERSTATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The United States District Court had subject-matter jurisdiction over the underlying litigation pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

This is an appeal from a final Order of the District Court granting summary judgment to Defendant-Appellees Department of Corrections, Administrator Hauck, Ellis and Johnson. As such, this Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the District Court properly grant summary judgment for Defendant-Appellee Hauck as to Plaintiff-Appellant's Constitutional Claims, because the record demonstrates that no trier of fact could reasonably conclude that he engaged in conduct that violated either the Eighth Amendment or Article I, section 12 of the New Jersey Constitution, or that he was deliberately indifferent to the violation of Plaintiff-Appellant's rights by others?

2. Did the District Court properly grant summary judgment for Defendant-Appellee Hauck and NJDOC as to Plaintiff-Appellant's negligence claims, because the record demonstrates that no trier of fact could reasonably conclude that he engaged in conduct that violated the New Jersey Tort Claims Act?

1

## COUNTERSTATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously. Additionally, the undersigned is not aware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this Court or any other court or agency, state or federal. See L.A.R. 28.1(a)(2) aside from a case pending in the Superior Court of New Jersey, Hunterdon County, Law Division, docketed as Afdahl, et al. v. Melgar, et al., HNT-L00466-12.

## COUNTERSTATEMENT OF THE CASE[1]

In the period from November 2009 through approximately September 2010, plaintiff Christine Bernat was an inmate incarcerated at the Edna Mahan Correctional Facility for Women (EMCF) assigned to North Hall, one of its maximum security units. (A19, A22-23, Ra30, Tr. 78:1-5). From November 2009 until June 24, 2010, the bidded cage officer assigned to the second shift at North Hall was Defendant Senior Corrections Officer (SCO) Erick Melgar, and the bidded floor officer was Defendant SCO Janette Benette. (A168-A183).

On or about June 23, 2010, Robin Streater, one of the inmates assigned to North Hall, talked to her therapist, Dr. DeVita, about certain inappropriate conduct that Melgar had subjected her to, which included, among other things, stealing her

---

[1] "A" refers to the appendix filed with Plaintiff-Appellant's brief.
 "PBr" refers to Plaintiff-Appellant's brief.
 "Ra" refers to Defendant-Appellee's appendix.

commissary items and trying to "hug up" on her. (A169). DeVita told one of the Captains about Streater's claim, and on or about June 24, 2010, the information was conveyed to Appellee William Hauck, the Administrator of EMCF. (Id.) On the same day, Hauck responded to these allegations by referring the matter to the Department of Corrections Special Investigation Division (SID) for investigation. (A168-A183). To protect the inmates and ensure the integrity of the investigation, Hauck immediately reassigned SCO Melgar out of his bidded position in North Hall, and had a restriction memo issued prohibiting Melgar from even entering it. (A168-A183; Ra83-Ra92). Prior to being informed of DeVita's report concerning Melgar's alleged conduct against Streater, Hauck was unaware of any claims by any of the inmates in North Hall that Melgar had acted inappropriately towards them. (Ra84). Hauck was further unaware of any allegation on the part of any of the inmates in North Hall, including Bernat, that they were being subjected to inappropriate sexual contact by either Melgar or Smalls. (Id.) Prior to Streater's complaints to DeVita, none of the inmates who ultimately complained about Melgar had written an inmate remedy form with regard to the conduct that was ultimately the basis of their complaints about him. (A170).

Principal SID Investigator Kathleen Zdonowski was assigned to conduct the investigation. (Id.) Initially, Zdonowski ran into resistance from the North Hall inmates. On July 1, 2010, some nineteen inmates filed Inmate Remedy Forms

supporting Melgar and denying that he was engaging in misconduct. (A169). The sum and substance of the content of the inmate remedy forms was that defendant Melgar was professional, respectful, that he ran a good unit, and that he had done nothing wrong. (Id.) However, with Hauck's support, Zdonowski pursued the investigation despite these initial denials, and interviewed the inmates in July 2010. (A160-A172). As part of her investigation, Zdonowski interviewed inmates and staff. (A168-A183). Defendant Hauck followed up with the Investigator Zdonowski on a regular basis to keep track of the progress of her investigation and to give her whatever assistance she required. (Ra85).

From July 16 to 21, 2015 Investigator Zdonowski interviewed numerous inmates from North Hall. (A169). Most of the women corroborated one or more elements of Melgar's alleged abuse, including that he hit inmates with a ruler, that he sometimes wrestled with them, and that he threw ice on them in the showers. (A169-A174). Some of the inmates, including Clark, Dwight, and Hernandez, claimed some form of sexual abuse. (Id.)

By the middle of July 2010, most of the North Hall inmates had recanted their initial denials, and disclosed that Melgar had abused the North Hall inmates in a variety of ways, including having sexual contact with three or four of them, hitting with a ruler, throwing ice on them in the shower, and wrestling with them. (A168-A183).

4

Bernat was not one of the inmates who changed her story in July 2010. On the contrary, during her interview with Zdonowski in July, she adamantly maintained that Melgar had done nothing wrong, and issued a written statement dated July 16, 2010, reiterating Melgar's innocence. She continued to deny Melgar's inappropriate conduct throughout the summer of 2010.  On or about June 29, 2010, a few days after Melgar was removed from North Hall, Bernat wrote an inmate remedy form in support of him:

> I am writing with regards to C/O E. Melgar-N. Hall 2nd shift. C/O Melgar was banned from n. Hall on 6-24-10 & many inmates such as myself are upset due to the current situation. For the last couple months c/o Melgar has been threatened by several inmates stating "they will take his job." C/O Melgar is by the book & doesn't just allow anything to go on down here like other officers do because of that he is disliked. Inmates that he's had to reprimand made threats. Inmates that haven't gotten their way have made threats. C/O Melgar has always been fair & held a professional position. When inmates need assistance he does is job like he's supposed to. It's very sad that inmates can make up lies and slander an officers name due to not liking them or getting their way. From what I hear the same inmates are going to target C/O Bennet next. We just want our regular officers back so our unit can go back to normal.

> [Ra69-Ra70].

In an inmate statement dated July 16, 2010, which Bernat wrote in conjunction with her interview with Investigator Zdonowski, she stated:

> I am writing on the current situation regarding SCO Melgar. I have been back in this facility for almost a year

5

now & I've witnessed a lot of nonsen[se] with the inmates housed in N.Hall. SCO Melgar does not allow or tolerate the behavior that goes on other shifts. SCO Melgar demands that the rules & regulations are followed on his shift at all times. No shower shoes, no door visiting, one hour for smoke break. When he demands that the rules be followed, the inmates here have an issue with that, due to being allowed to run wild on other shifts. I have witnessed inmates & officers being blamed for eating another inmates snacks. When in fact they ate it themselves. I have witnessed inmates throwing ice on other inmates while in the shower. Running away & saying Melgar did it or an inmate who had no idea what was going on. This is all inmate horseplay & SCO Melgar has been targeted because he's not laid back like other officers. I've heard inmates say they wanted him gone because he's a pain in the ass. Honestly, SCO Melgar is a pain & he's not a favorite of mine, but he's doing his job & people/inmates are not fond of him [do] to that. They respect & like the officers who let the de what they want. There's not many who will speak on his behalf because he is a dick, but he's enforcing the rules that this facility has made, so why sack him, it's his job.

[Ra71-Ra72].

Despite the statements by Appellant and others that Melgar had not done anything wrong, on July 22, 2010, Investigator Zdonowski contacted the Sex Crimes Unit of the Hunterdon County Prosecutor's Office to discuss the allegations against Melgar. (A173). On or about July 23, 2010, Defendant Hauck received a phone call from Investigator Zdonowski who recommended that Melgar be moved entirely out of the institution. (Ra86). Hauck followed this recommendation and a restriction memo banning Melgar from the facility was issued on or about July 23,

and Melgar was transferred to the Mountainview Youth Correctional Facility. (Ra86). Zdonowski also cooperated with the investigation conducted by Sergeants Michael Nugent and Kristen Larsen of the Hunterdon County Prosecutor's Office. (Ra90).

On or about August 23, 2010, Investigator Zdonowski forwarded her investigation report to Administrator Hauck. (Ra86-Ra87). Investigator Zdonowski substantiated the inmates' allegations against Melgar, and forwarded her report to both Administrator Hauck and the Hunterdon County Prosecutor's Office, Sex Crimes Unit, for whatever action it deemed appropriate. (A176). It was Administrator Hauck's position that proven undue familiarity and conduct unbecoming cases should always result in termination. (Ra91-Ra92). Based on the information provided in Zdonowski's report, Hauck recommended to Director Kenneth Green that Melgar be terminated, a conclusion that was consistent with Hauck's and the Department of Correction's past practices. (Ra88). On August 30, 2010, based on Zdonowski's report, Defendant Melgar was suspended with pay pending his Loudermill hearing. (Id. at 24). Defendant Melgar failed to appear at his Loudermill hearing on September 2, 2010, and he was suspended without pay. (Id. at 25). Defendant Melgar was ultimately terminated from employment with the Department of Corrections. (Id. at 26). As of August 30, 2010, the date on which

the proceedings to terminate Melgar commenced, Bernat still insisted that Melgar was innocent. (Ra35, Tr. 99:15-21; Ra35-Ra36, Tr. 101.10-102.4; A180).

However, with Hauck's approval, Zdonowski continued her investigation even after the decision to terminate Melgar had been made. As part of this continued investigation, on September 2, 2010, Zdonowski interviewed inmate Barbara Clark, who told her Bernat had told her (Clark) that she was having oral sex and sexual intercourse with Melgar. (A177). Zdonowski also interviewed inmate Tia Ryans, who not only corroborated Bernat's sexual relationship with Melgar, but also informed her of sexual contact that Bernat was having with Defendant SCO Smalls as well. (A180). On September 8, 2010, Zdonowski re-interviewed Tia Ryans, who corroborated Bernat's sexual relationship with Melgar, and also revealed that Defendant Smalls was bringing gifts to the Bernat and also having sexual contact with her. (A171).

On September 10, 2010, Zdonowski confronted Bernat with the statements of Clark and Ryans. (Ra35, Tr. 99:15-21; Ra 35-Ra36, Tr. 101:10-102.4). After Zdonowski told Bernat she could be disciplined if she did not tell Zdonowski the truth, Bernat revealed her sexual relationship with Melgar and Smalls. (Ra10-Ra11; Ra30, Tr. 80:12-13; A172; A180-181; Ra73-Ra77). Bernat made both a written and an oral statement in which she described a gradually escalating pattern of sexual contact with Melgar which culminated in their having actual intercourse

8

on several occasions. (Id.) Bernat admitted that she never saw Melgar again after June 20, 2010. (Ra30, Tr. 80:20-81:1; Ra47, Tr. 149:1-4).

Bernat never complained or told anyone on the prison staff about her sexual contact with Melgar prior to the time she told Zdonowski about it:

> Q. Okay. Did you ever complain to anyone prior to one of the exhibits that we went over before where you wrote starting in November and went through to June, prior to that did you ever complain to anyone that was a staff member or corrections officer at the prison?
> A. Prior to me telling the time—
> Q. Prior to finally—when you said you had broken down and told?
> A. No.
> Q. You never had old anybody prior to that?
> A. No.

> [Ra47, Tr. 149:1-15].

> Q. Okay. Now, prior to the time that this happened, that you made these statements, had you ever made a complaint about what Melgar was doing with you?
> A. No.
> Q. Not to anybody?
> A. I-I never made a complaint before.
> Q. Okay. And in fact, at this time it was not at least your intention to make a complaint, at the time you wrote this statement, meaning June 29?
> A. No.

> [Ra25, Tr. 58.19-59.3].

> Q. Now, you also indicate that you had an—and during this entire period you never made any complaint to any prison authorities about what was going on between you and him?
> A. I didn't.

9

[Ra33, Tr. 91.19-23].

During the same September 10, 2010 interview in which she told Investigator Zdonowski about her sexual relations with Bernat, plaintiff also told Zdonowski about the sexual contact she had with Smalls. (A172). Bernat described her conduct with Smalls in a statement to Investigator Zdonowski. (A181). Smalls started bringing her items before they had sexual contact. (Ra34, Tr. 96.3-8). He brought her things like cherry tobacco of his own accord in the beginning. (Id., Tr. 94.14-22). Bernat asked him for more because she was selling it. (Id., Tr. 94.14-22). Plaintiff never had sex with Smalls. (Ra33, Tr. 91-24-92.1). Smalls' contact with her was limited to kissing and touching her breasts, which occurred only four or five times. (Id., Tr. 92.2-93.2). Further, Smalls gave Bernat notes saying that he loved her. (Id., Tr. 93.13-24).

As a result of this new information, Zdonowski issued a supplemental report on or about November 22, 2010, that substantiated charges against both Smalls and Bennett (for complicity). (A168-A183; Ra89-Ra90). Proceedings to terminate Smalls employment commenced on November 23, 2015. (Ra91). Based on the Zdonowsky investigation, Melgar, Smalls and Bennett were all terminated. (Ra83-Ra92).

On or about April 22, 2004, then Commissioner Devon Brown issued Directive 03.002, which made clear that undue familiarity, i.e., unauthorized

10

contact, including any sexual contact, between a staff member and an inmate, was strictly forbidden and would not be tolerated. (A100-A104, Ra83-Ra88). During his time as Administrator, Hauck's policy was to seek termination of anyone who was found guilty of undue familiarly. (A169-A170). Hauck made sure that everyone at the facility knew that undue familiarity would not be tolerated. (A170). Based on his training and the pattern and practice at EMWCF, Defendant Melgar was aware that any kind of sexual contact or other undue familiarity with inmates was forbidden:

> Q. From 2009 to 2010 was it absolutely clear to you, based on your training, based on your pattern and practice you saw in the jail and what have you that under no circumstances could you have any kind of sexual contact with an inmate?
> A. Yes.
> Q. Was it also understood, based again on your training and your general patterns and practices you saw around you, that you could not touch females except upon actual necessity?
> A. Yes.
> Q. There's no doubt in your mind at that time?
> A. Yes.
> Q. Would it be fair to say there was no doubt in your mind about those two things throughout the period of time you worked for Corrections?
> A. Yes.

> [Ra81-Ra82].

Melgar signed a memo that specifically addressed the ban on sexual activity between officers and inmates. (Id.)

11

Plaintiff filed this case on or about May 3, 2012. Defendants Hauck and Edna Mahan moved to dismiss. In an order dated February 28, 2013, the court dismissed the case against Edna Mahan with prejudice, and dismissed the case against Hauck without prejudice, giving the plaintiff permission to file an amended complaint suing Hauck in his individual capacity.

In her First Amended Complaint, Bernat alleged seven causes of action. Count One is brought under 42 U.S.C. 1983 claiming that the individual State Defendants, Hauck, Ellis and Johnson, violated her constitutional rights. Count Two, alleges a similar claim under the New Jersey Civil Rights Act; Count Three, alleges the tort of Negligent Hiring and Supervision; Count Four, Assault and Battery; Count Five, Common Law Negligence; Count Six, Intentional and/or Negligent Infliction of Emotional Distress; and Count Seven, Invasion of Privacy. (A13-A33).

On May 11, 2015, the State defendants filed a motion for summary judgment. (A36). On October 28, 2015, the District Court granted the State Defendants' motion for summary judgment, and dismissed Appellant's remaining claims with prejudice. (A2).

In his October 28, 2015 Opinion and Order, Judge Shipp granted summary judgment in favor of Defendant-Appellants Department of Corrections, Hauck, Ellis, and Johnson. Judge Shipp concluded that Plaintiff's claim against Hauck for

failure to protect her failed because "Plaintiff has not made a sufficient showing of deliberate indifference." (A5). Judge Shipp found that as to the Section 1983 claims against Johnson and Ellis, the "allegations of verbal harassment, however, do not give rise to a constitutional violation enforceable under Section 1983." (A7-A8). Judge Shipp further concluded that "with respect to Plaintiff's negligence claims, as Plaintiff has not shown that either Defendant Ellis or Johnson had any supervisory responsibilities, Plaintiff has not shown that these Defendants either had a duty or power to prevent Officers Melgar and Smalls' conduct." (A8). Finally, the Court dismissed Plaintiff's negligence claim against Hauck, concluding that "Plaintiff has not offered any admissible evidence to show that Hauck knew of Officer Melgar and Smalls' conduct prior to June 2010." (A9).

On May 19, 2016, Appellant appealed to this Court the dismissal of the Section 1983 and NJCRA as to Hauck only, and negligence claims as to Hauck and the NJDOC. (A1).

## SUMMARY OF ARGUMENT

The District Court correctly dismissed Appellant's Section 1983 and NJCRA claims for failure to protect against Hauck and her tort claim of negligence against Hauck and the NJDOC. The evidence demonstrated that, prior to 2010, Hauck had no knowledge of Melgar and Smalls' conduct. As the District Court found, Appellant failed to present any evidence that would demonstrate that Hauck was

13

made aware and subsequently acted in a deliberately indifferent manner in regards to Appellant. Further, the Court correctly concluded that the New Jersey Department of Corrections and Hauck had not acted in a negligent manner and that Appellant had failed to provide evidence to support such a cause of action.

## COUNTERSTATEMENT OF STANDARD OF REVIEW

This Court exercises plenary review over a District Court's grant of summary judgment, as well as the District Court's interpretation of the Constitution. Blackhawk v. Pennsylvania, 381 F.3d 202, 206 (3d Cir. 2004).

Summary judgment may be granted if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000). An issue is "genuine" only if a reasonable jury could possibly find in the non-movant's favor on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" only if it influences the outcome under the applicable law. Id. at 248. The non-moving party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993). It must go beyond the pleadings and point to specific

factual evidence showing there is a genuine material issue for trial.  <u>Celotex</u>, <u>supra</u>, 477 <u>U.S.</u> at 323-24.

## **LEGAL ARGUMENT**

## **POINT I**

### THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S CLAIM FOR DELIBERATE <u>INDIFFERENCE AGAINST APPELLANT HAUCK</u>

As the court stated in <u>Trafton v. City of Woodbury</u>, 799 <u>F. Supp.</u> 417 (Dist. Ct. 2011), "this district has repeatedly interpreted NJCRA analogously to § 1983." This approach is consistent with the New Jersey Courts' own interpretation of the New Jersey Civil Rights Act, which consistently follows 1983 precedent in deciding New Jersey Civil Rights Act claims. Thus for example, in <u>Ramos v. Flowers</u>, 429 <u>N.J. Super.</u> 13, 24 (App. Div. 2012), the Appellate Division, noting the close relationship between 1983 and the New Jersey Civil Rights Act, held that the doctrine of qualified immunity as developed in the Federal 1983 cases also applied to cases brought under NJCRA. Similarly, based on its comparison of NJCRA and 1983, the New Jersey Appellate Division in <u>Rezem v. Millstone</u>, 423 <u>N.J. Super.</u> 103, 115 (App. Div. 2011) stated that "we see no reason to apply different elements to a cause of action brought under the State statute from those the New Jersey Supreme Court in <u>Rivkin</u> found were applicable under federal civil rights legislation." Based on this case law, defendants' treated the plaintiff's

Section1983 claims in Count I and her New Jersey Civil Rights Act claims in Count II as being fundamentally the same and subject to the identical legal requirements.

It is axiomatic that individual liability under 42 <u>U.S.C.</u> 1983 cannot be based on respondeat superior, but must rather be based on individual's own wrongful acts or omissions. <u>Monell v. Dept. of Social Services</u>, 436 <u>U.S.</u> 658, 694 n. 58 (1976).

In the prison context, in order to show the deliberate indifference required to establish that prison officials violated the eighth amendment, an inmate must show that the officials were aware of the condition that put the inmate in danger. <u>Beers-Capitol v. Whetzel</u>, 256 <u>F.</u> 3d 120, 131, (1970). Here, there is no evidence that Hauck knew that either Defendant Melgar or Defendant Smalls was having sexual relations with the plaintiff prior to June 20, 2010, the date of Melgar's last sexual contact with the plaintiff, (A114-A115; Ra30, Tr. 80:12-13, 80:20-81:1; A171) or that they knew that either Melgar or Smalls was acting inappropriately towards either Bernat or any other inmate. (Ra84). "An Eighth Amendment claim against a prison official must meet two requirements: (1) 'the deprivation alleged must be objectively, sufficiently serious;' and (2) the 'prison official must have a sufficiently culpable state of mind.'" <u>Beers-Capitol, supra</u>, at 125, citing <u>Farmer v. Brennan</u>, 511 <u>U.S.</u> 825, 834 (1970). "In prison conditions cases, 'that state of mind is one of deliberate indifference." <u>Id.</u>

In order to show the deliberate indifference necessary to sustain a prisoner's eighth amendment claim against a prison official, she must show that "'…the official knows of and disregards an excessive risk to inmate health or safety." Beers-Capitol, supra, 256 F. 3d at 131, quoting Farmer, supra, 511 U.S. at 837. "This requirement of actual knowledge means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. "To be liable on a deliberate indifference claim, a defendant prison official must both know and disregard an excessive risk to inmate health or safety." Beers Capitol, supra, at 133 (cite omitted). "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." Id. (Emphasis supplied)

Furthermore, even where a plaintiff can make out a prima facie case of deliberate indifference, a defendant can rebut the prima facie case by "…establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did now of the risk, he took reasonable steps to prevent the harm from occurring." Beers-Capitol, supra, at 133.

In Beers-Capitol, the plaintiffs, residents in the Youth Development Center at New Castle, Pa. (YDC), a facility for juveniles run by the State of Pennsylvania,

sought to sue the Executive Director of that facility, Robert Ligget, for a violation of their eighth amendment rights based on sexual assaults perpetrated on them by Barry Whetzel, a youth development aide at YDC. The court held that despite evidence that Ligget's policy's in the institution might have been negligent, the Farmer standard for liability required "actual knowledge or awareness on the part of the defendant," and that the evidence before the court did not establish that the risk of harm to the plaintiffs was "so great and so obvious" that Liggett must have known about it. Beers-Capitol, supra, at 137-138.

In this case, in sharp contrast to Beers Capitol, the evidence would not even support an inference that Hauck was negligent in his response to allegations about Melgar's behavior; much less that he knowingly disregarded them.

Hauck denies knowing either that Melgar was having sexual relations with Bernat prior to June 24, 2010, when the investigation that led to Melgar's reassignment and ultimate termination commenced, or that Melgar was acting inappropriately with regard to any of the other inmates. (Ra84). According to Hauck, his first notice of Melgar's inappropriate behavior was when he was informed, on or about June 24, 2010, that on June 23, 2010, another inmate in Melgar's unit, Robin Streater, had told DeVita that Melgar had tried to "hug up" on her. (A169; Ra84-Ra85) It is undisputed that upon being informed of these

allegations, Hauck, in his position as administrator, took immediate and effective action.

First, on June 24, 2010, the very day when Hauck learned of Streater's allegations, he immediately referred the matter to SID for investigation. (A169). On the same day, he took the prophylactic measures of reassigning Melgar out of the unit and having a restriction memo issued that prohibited Melgar from entering the unit until the investigation was completed. (Ra1-Ra6; Ra85). A month later, on July 23, 2010, after the investigation began to suggest that Melgar might be guilty of substantial misconduct, Hauck, at the suggestion of Principal Investigator Zdonowski, had Melgar transferred to the all-male Mountainview facility. (Ra86).

Not only were these actions reasonable, they were spectacularly successful. Plaintiff admits that her last sexual contact with Melgar was June 20, 2010 (Ra10-Ra11; Ra30, Tr. 80:12-13; A181), and that she never saw Melgar again after he was removed from North Hall on or about June 24, 2010. (Ra30, Tr. 80:2-81:1). Thus Hauck's timely actions successfully prevented further abuse from occurring.

The investigation was also successful in bringing the full range of Melgar's misconduct to light. It revealed that Melgar's abuse was not limited to Streater, but extended to many of the other inmates in North Hall as well, and that Melgar's misconduct was far more serious than Streater's initial report suggested. (A168-A183). It showed that not only had Melgar engaged in prohibited sexual contact

with several of the inmates, but that he had engaged in other abusive behavior as well, including hitting the inmates with a ruler, throwing ice on them in the shower, and wrestling with them. Id.

Far from being deliberately indifferent, the record shows that Hauck and Zdonowski were committed to investigating the allegations, which ultimately led to the discovery and termination of Melgar, Bennett and Smalls. The record shows that they were not deterred by the initial reaction of virtually all of the inmates in North Hall, including Bernat and Streater, resisting the investigation with claims that Melgar had done nothing wrong. (A169). Instead, Zdonowski, with Hauck's support, saw through the inmates' resistance and got them to come forward with the numerous charges of misconduct that led to the officers' termination. (A169-A174; Ra85).

Hauck and Zdonowski's persistence paid off in mid-July 2010, when inmate after inmate changed her initial statement and described Melgar's inappropriate conduct in detail. (A169-A175). These statements resulted in a report by Zdonowski, dated August 23, 2010, that substantiated the inmates' claims against Melgar and Bennett. (A169-A177; Ra88).

It should be noted that Bernat participated in impeding the investigation, even after others began cooperating. While most of the North Hall inmates had told Zdonowski about Melgar's inappropriate conduct towards them by the middle of

July 2010, on July 16, 2010, Bernat wrote a second statement denying Melgar's inappropriate conduct and ascribing the other inmates' complaints to resentment about Melgar's tough enforcement of the rules. (Ra71-Ra72). Bernat's denials continued until September 10, 2010, when she finally told the truth. (A22; Ra30, Tr. 80:12-13; Ra35, Tr. 99:15-21, Tr. 101:10-102.4; A172; A180-A1823; A69-A72).

Furthermore, Bernat's eventual admission of Melgar's sexual conduct with her was itself the direct result of Zdonowski's and Hauck's determination to see the investigation through. Despite the fact that the decision to terminate Melgar had already been made by August 30, 2010, Zdonowski, with Hauck's support, continued to talk to the inmates about what they knew about Melgar's activities. (A177-A183). This led to Zdonowski's learning, in a September 2, 2010 conversation with inmate Barbara Clark that the plaintiff had admitted to Clark that she was giving Melgar oral sex and having sexual intercourse with him. (A177). She also learned from inmate Tia Ryans that Defendant Smalls was also having inappropriate sexual contact with the plaintiff. (A180).

During her September 10, 2010, interview with the Bernat, Zdonowski confronted plaintiff with Clark's allegations. (Ra35, Tr. 99:15-21, Tr. 101:10-102:4). In response, plaintiff again attempted to deny that she'd had sex with Melgar. (Ra35, Tr. 99:15-21). It was only when Zdonowski told Bernat that she

could be disciplined for lying that the Bernat broke down and admitted what had happened. (Ra35-Ra36, Tr. 101:10-102:4; A180-A181). During the interview, Bernat for the first time informed prison officials about Smalls' bringing her tobacco, rolling papers, gums and candy and touching her breasts, thus opening a new investigation that eventually resulted in Smalls' being first suspended then terminated as well. (Ra47, Tr. 149:1-15; A168-A183).

On appeal, Appellant first argues that the lower court should have accepted SCO Smalls' testimony as true. (Ab17). She specifically references Smalls' testimony that the prison operated as "a free for all" and that "there's no real rules." Id. This testimony in no way would lead any reasonable trier of fact to conclude that Hauck was deliberately indifferent to the claims regarding officer Melgar. In the portion of the deposition attached by Appellant, Administrator Hauck is never mentioned. (A162-A167). Additionally, Appellant appears to make unsupported inferences regarding the enforcement of rules related to sexual encounters,which is unsupported by the testimony of SCO Smalls. Even taking the testimony of SCO Smalls as true for the purpose of summary judgment, Appellant would still have failed to meet the threshold for a cause of action under Section 1983.

Appellant's next argument on appeal asserts that the District Judge failed to adequately consider a letter from another inmate allegedly sent to Hauck. (Ab18).

As Appellant recognizes, the District Court considered this letter and discounted its credibility.  In analyzing the letter, the court stated that Appellant failed to provide any affidavit from the alleged author of the letter, Theresa Afdahl, or a statement from Afdahl confirming that she wrote the 2008 letter. (A5). Additionally, the court recognized that Hauck testified that he did not remember seeing the letter and the letter does not contain any marks acknowledging receipt, despite the fact that other correspondence that Hauck received from Afdhal did contain such marks. Id. Based upon the foregoing, the court deemed the letter inadmissible. Id.

However, the court went a step further and analyzed the impact of the letter if it were admissible. Id. In doing so, the Court concluded that the content of the letter was not sufficient to put Hauck on notice as to the risk of Melgar's sexual abuse. Id. Further, the Court noted the letter references "instances of non-sexual playing, which although inappropriate is a far cry from Melgar's sexual abuse, and thus did not put Hauck on notice as to the risk of this behavior." Id. Based upon the foregoing, the District Court correctly concluded that even considering the letter, Bernat had failed to establish that Hauck was deliberately indifferent.

Appellant next attempts to argue that the Court failed to appropriately consider the certifications of other inmates in support of Bernat's contention that Hauck had notice of Melgar's abuse in 2008. (Ab8). The certifications certify to the truth of allegations in a separate case, Afdahl, et al. v. Melgar, et al., Docket

23

Number HUN-L-464-07. (A7). The only allegation against Hauck states that "Defendant Hauck was personally informed by Plaintiff Adahl and/or others about the abuse behavior of Defendant Melgar as early as 2008, yet did nothing to prevent it, nor did he report it to his supervisors." (A7). The Court concluded that the certifications vague references to "Afdahl and/or others" and "abusive behaviors" was an insufficient evidentiary basis on which a "reasonable juror could find that Hauck was given notice of Defendant Melgar's sexual abuse of other inmates prior to June 2010." (Id.) The Court further concluded that the complaint indicated that "out of fear of retaliation, inmate Robin Streater did not disclose Melgar's sexual abuse prior to 2010." (Id.)  The certifications were vague and ambiguous, and insufficient to support a claim for relief under Section 1983. The Court correctly concluded that the certifications were insufficient to defeat Appellees' Motion for Summary Judgment as to the Section 1983 claim against Hauck.

Finally, Appellant attempts to argue that an adverse inference should have been provided based upon an alleged file that was not produced by Administrator Hauck. (Ab19). However, it is clear from the record below and admitted by Appellant that the first time she made reference to an alleged file was in her opposition to Appellees' motion for summary judgment. (Id.) If she believed that documentation existed that was not produced in discovery, she had an obligation to

24

bring it to the court's attention during the discovery period, which she failed to do. Bernat is trying to create an issue of fact from Hauck's statement during his deposition; however, the District Court did not read any such inference. Bernat cites to Bewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), in support of a proposition that an adverse inference can be issued if it was discovered that evidence was not produced or destroyed. However, in Bewer, there was no dispute that the file at issue was lost and could not be produced. (Id. at 334). In this matter, Bernat has made no assertion that the evidence was either not produced pursuant to a request or destroyed. Instead, it is clear from the record that the first time Bernat brought up Hauck's statement was in her opposition to State Defendants' Motion for Summary Judgment. As such, an argument for an adverse inference in accordance with Bewer is not applicable and there is no issue of fact that would require reversal of the District Court's decision.

Additionally, there is no evidence that Hauck knowingly withheld evidence at any point in this case. The record reflects that Hauck was totally unaware of any allegations that Melgar had engaged in inappropriate actions with regard to either the plaintiff or any other inmates prior to June 24, 2010, or that either Melgar or Smalls was having sexual contact with the plaintiff. (Ra83-Ra84). The plaintiff admitted that she had never written an inmate remedy form about it or otherwise informed prison officials prior to the time that Melgar was moved and the sexual

abuse stopped. (Ra25, Tr. 58:19-59:3; Ra33, Tr. 91:19-23; Ra47, Tr. 149:1-15). She admitted that she continued to vigorously deny any inappropriate conduct by Melgar towards her until September 10, 2010, and only told about it then because of the pressure put on her by Investigator Zdonowski. (Id.) It is undisputed that upon being notified of Streater's allegations, Hauck took effective action that ended Melgar's abuse and ultimately led to the termination of Melgar, Bennett and Smalls. In the face of these indisputable facts, plaintiff's claim that Hauck's conduct violated the Eighth Amendment cannot lie. The claim against Hauck must be dismissed.[2]

## POINT II

### THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S NELIGENCE CLAIMS

Plaintiff's complaint contains two negligence counts. Count three alleges negligent hiring, training, supervision, etc. Count Five alleges general common law negligence. However, plaintiff cannot show that the defendants had notice of the characteristics of either Melgar or Smalls that made it likely they would engage in

---

[2] Appellant conceded that the District Court did not err in granting summary judgment for Defendants Johnson and Ellis on the Section 1983 claim because "the level of harassment falls short of actionable harassment and we lack direct and/or circumstantial evidence of their knowledge of sexual assaults occurring prior to Ms. Bernat being sexually assaulted." (Ab20). As such, those claims should remain dismissed with prejudice. Appellant also does not mention Ellis or Johnson in Count II of her merits brief. Therefore, she has waived the appeal of all counts against Ellis and Johnson, and Appellees will not address either in this opposition.

improper conduct. Furthermore, there is no evidence that any of the defendants acted negligently once they became aware of Melgar and Smalls's character, or that any harm to the plaintiff was proximately caused by the defendants' negligent action. Finally, as to Defendants Ellis and Johnson, as mere non-supervisory Senior Court Officers, neither of them had either the duty or the power to prevent Melgar's and Smalls' actions towards the plaintiff.

To prevail on a claim of negligent hiring or retention, a plaintiff must show two things. First, "(a)n employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." Di Cosala v. Kay, 91 N.J. 159, 173 (1982). "The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." Id. at 174.

The elements of common law negligence are similar. A "negligence cause of action has four elements: (1) duty of care, (2) breach of duty, (3) proximate cause, and (4) actual damages)." Weinberg v. Dinger, 106 N.J. 469, 483(1985). Like the negligent hiring cause of action, a negligence cause of action requires notice of the condition (or in this case, the propensities, of Smalls and Melgar), that caused an

unreasonable risk of harm. <u>Carter Lincoln-Mercury v. EMAR Group</u>, 135 <u>N.J.</u> 282 (1994).

Applying these principles here, Bernat cannot establish a prima facie case of negligence against Hauck, and vicariously against the NJDOC, because is undisputed that prior to June 24, 2010, Hauck had no information indicating that either Melgar or Smalls was engaging in inappropriate contact with either Bernat or with any other inmates. (Ra84).

Bernat's negligence claims must also fail because Hauck did not act negligently once he learned about Streater's allegations. Despite the fact that the only information he had concerned Streater, and that even Streater's complaints seemed at first blush relatively minor, Hauck took immediate, aggressive, and competent action, both to protect the inmates and to see that Streater's charges were investigated. Those actions were successful in ending the abuse. (A168; Ra84-Ra85).

The record likewise establishes that inappropriate behavior of Smalls and Melgar was not caused by any failure to train or by policies that did not make it clear that sexual contact with the inmates was strictly forbidden.  It is undisputed that as early as 2004, then commissioner Devon Brown circulated DIRECTIVE#COM.03.002 to all employees, which all employees had to sign for, and which explicitly warned all DOC employees that any unauthorized physical

contact with inmates, including especially sexual contact, would not be tolerated. (A100-A104; Ra91).

Hauck confirms that the prohibition against unauthorized contact with inmates, especially sexual contact, was made clear to all of the officers on his watch, and that his own policy was to seek termination for every case of sexual contact that came to his attention. (Ra84-Ra85). Furthermore, that policy was further brought home by the fact that over the years, several officers were actually fired for undue familiarity. Id.

But the most eloquent testimony that Melgar's conduct was not the result of any failure to train or to have appropriate policies comes from Melgar's own mouth:

> Q. *From 2009 to 2010 was it absolutely clear to you, based on your training, based on your pattern and practice you saw in the jail and what have you that under no circumstances could you have any kind of sexual contact with an inmate?*
> A. *Yes.*
> Q. *Was it also understood, based again on your training and your general patterns and practices you saw around you, that you could not touch females except upon actual necessity?*
> A. *Yes.*
> Q. There's no doubt in your mind at that time?
> A. Yes.
> Q. Would it be fair to say there was no doubt in your mind about those two things throughout the period of time you worked for Corrections?
> A. Yes.
> [Ra81-Ra82].

29

In sum, there is simply no basis for the plaintiff's negligence claims, whether under count three or count five, against either Hauck or against the institutional defendants.[3]

## POINT III

EVEN IF THE COURT FINDS THAT THE CONDUCT OF HAUCK GIVES RISE TO LIABILITY UNDER 42 USC 1983 OR THE NEW JERSEY CIVIL RIGHTS ACT, THE CLAIMS WOULD BE PROPERLY DISMISSED UNDER THE DOCTRINE OF QUALIFIED IMMUNITY (ARGUED BELOW BUT NOT ADDRESSED)

A. Qualified Immunity Protects All But Those Who Knowingly Violate The Law

Qualified immunity is an affirmative defense under the 42 U.S.C. 1983. Ramos v. Flowers, 429 N.J. Super. 13, 33 (App. Div. 2012). It "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted).

The protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law

---

[3] Plaintiff makes no reference to Counts Four, Six or Seven, which were dismissed below by Judge Shipp. As those counts are not addressed in Plaintiff-Appellant's Brief and as such Plaintiff-Appellant has not appealed those counts, the Defendant-Appellants will not address them now.

and fact." <u>Pearson v. Callahan</u>, 555 <u>U.S.</u> 223, 231 (2009) (internal quotations omitted).

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson</u>, 555 <u>U.S.</u> at 231. Two questions must be answered in the affirmative before this protection is pierced: 1) is the officer alleged to have violated a constitutional right; and 2) was the right alleged to have been violated so clearly established that it would have been clear to a reasonable officer that his actions violated the law. <u>Id.</u> at 232. These questions may be analyzed in either order. <u>Id.</u> at 242. Where the underlying facts are disputed, the doctrine's applicability is a question of law. <u>Curley v. Klem</u>, 499 <u>F.</u>3d 199, 210 (3d Cir. 2007). The second prong is the focus of this inquiry.

When analyzing whether the government official's conduct violated a "clearly established right," the "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" <u>Brosseau v. Haugen</u>, 543 <u>U.S.</u> 194, 198 (2004) (citing <u>Saucier v. Katz</u>, 533 <u>U.S.</u> 194, 206 (2001)). Rather, "'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right.'" Id. at 202 (citing Anderson, 483 U.S. at 640). In making this inquiry, courts examine the legal precedent that existed at the time the conduct allegedly occurred, and determine whether it would place a reasonable official on notice that his conduct violated the law. Ashcroft v. al-Kidd, 563 U.S. ____, 131 S. Ct. 2074, 2083-84 (2011). While the courts do not "require a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 2084.

The al-Kidd case is illustrative. There, the Court considered whether a former attorney general was entitled to qualified immunity for "authorizing federal prosecutors to obtain valid material-witness warrants for detention of terrorism suspects whom they would otherwise lack probable cause to arrest." Id. at 2079. In holding that the law was not clearly established enough to deny qualified immunity, the Court noted that "not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional." Id. at 2083. While the Court has not unequivocally voiced what precedent would "place the statutory or constitutional question beyond debate," id. at 2083-84, the Court has expressed skepticism that even a controlling circuit precedent constitutes clearly established law for purposes of qualified immunity. See Carroll v. Carman, ___ U.S. ___, 135 S. Ct. 348, 350 (2014).

32

B. <u>No Clearly Established Law Existed Classifying Any of Hauck's Actions as Unconstitutional</u>

As made clear above, Bernat has provided insufficient evidence to prove that Hauck had violated any of Bernat's constitutional rights. In her moving brief, Appellant does not cite to any statute, case law, regulation, or policy that proscribes that the actions taken by Hauck would amount to a violation of Bernat's constitutional rights. Here, there is simply no evidence that suggests Hauck violated Bernat's constitutional rights or that even if the Court had concluded such, there was no case law at the time of this incident that clearly established that Hauck's actions would amount to a constitutional violation. As such, there was no "unequivocally voiced precedent" that would place the "statutory or constitutional question beyond debate," as required by <u>al-Kidd</u>, <u>supra</u>, at 2079. Accordingly, Counts One and Two of the complaint would be properly dismissed against Hauck for this reason as well.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants Department of Corrections, Hauk, Ellis and Johnson respectfully submit that the judgment of the District Court should be affirmed.

Respectfully submitted,

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF
NEW JERSEY

By:    <u>/s/ Nicole E. Adams</u>
Nicole E. Adams
Deputy Attorney General
NJ Bar ID # 063282013

By: <u>/s/ Robert Preuss</u>
Robert Preuss
Deputy Attorney General
NJ Bar ID #051011997

DATED: March 13, 2017

## **Certification Of Bar Membership**

I, NICOLE E. ADAMS, counsel for Appellees, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

By:   /s/ Nicole E. Adams
      Nicole E. Adams
      Deputy Attorney General
      NJ Bar ID # 063282013

DATED: March 13, 2017

## **Certificate Of Compliance With FRAP 32(a) and LAR 31.1**

This brief complies with the word limit requirements of FRAP 32(a) as the brief is 7,744 words and prepared in Times New Roman, 14 point font.

This brief complies with the electronic filing requirements of LAR 31.1(c) as the text of this electronic brief is identical to the text of the paper copies and was checked for viruses using Symantec Endpoint Protection on March 13, 2017 and no viruses were found.

By:    /s/ Nicole E. Adams
          Nicole E. Adams
          Deputy Attorney General
          NJ Bar ID # 063282013

DATED: March 13, 2017